106 So.2d 270

Stewart SUMERAL

v.

STATE.

8 Div. 395.

Court of Appeals of Alabama.

Nov. 5, 1958.

Bill Fite, Hamilton, for appellant.

John Patterson, Atty. Gen., and Geo. D. Mentz, Asst. Atty. Gen., for the State.

CATES, Judge.

Sumeral was indicted for the grand larceny of some rolls of wire fencing, the property of Braxton Dempsey. A jury in the Franklin Circuit Court found him guilty and he appeals.

Viewed from the verdict, the State's case tended to show (unless otherwise indicated):

Tuesday evening, June 18, 1957, about five o'clock, Braxton Dempsey had gotten off work and when he reached home he found a crib—part of his barn—had been broken into and six rolls of barb wire fencing and twelve of hog wire were gone. Swaths through the weeds showed how the rolls were transported to the nearby public road.

The Sunday before Dempsey had been to the crib and saw the fencing through a crack in the crib door. He had spent Sunday night at his mother's dwelling house near the barnyard.

Monday night his mother visited Dempsey at his home some considerable distance away so that no one was staying in the mother's house that night.

That same Monday night about 8:30, Sumeral had borrowed a 1949 Ford pick-up truck from Milford Oliver. Sumeral and his wife testified he hauled fruit jars home with the pick-up. One of the State's witnesses stated he did not bring the truck back to Oliver until 3:00 or 3:30, A.M.

It had rained "along after dinner" Monday afternoon. No evidence was given of the amount of rain. Tuesday afternoon Dempsey saw automobile tire prints on an old roadbed whence the tracks through the weeds led back to the crib. The sheriff made plaster of paris casts of the tire prints from the marks of each of the four wheels.

Later he took casts direct from three of the tires on Oliver's truck. These impressions, so the sheriff stated, matched three of the casts made in the road at Dempsey's place. The fourth wheel was accounted for by bringing it with its tire into court with its alleged corresponding cast.

Dempsey, on direct examination, testified in part:

"Q. When was the first time you observed the wire had been taken? A. Tuesday evening.

"Q. Tuesday evening? A. Yes sir.

"Q. About what time? A. It was around 5:00 o'clock I would say. * * *"

\* \* \* \* \* \*

"Q. Braxton, what kind of latch or lock did you have on the door of the crib where the wire was? A. I had an old latch like you drive a nail in and turn it, I had a trace chain and lock.

"Q. A pad lock? A. A Yale lock.

"Q. Was the chain cut or broken? A. No sir.

"Q. Tell the Court and Jury what you found about the door? A. On that door the lock was off, I didn't find the lock no where, it was missing.

"Q. The lock was not there at all? A. No sir.

"Q. Tell the jury what you observed in the vicinity of the grass and in the main road directly opposite the crib, if anything? A. Just tracks over it where they toted it from the crib to the road and bent it down.

"Q. What do you mean about the tracks, describe them? A. Where they mashed the weeds, where they were toting it along, it had growed up in weeds."

We are somewhat puzzled over the literal effect of the following excerpt:

"Q. That was on Tuesday afternoon? A. Yes sir.

"Q. You tell the jury when you left you know the wire was in the crib before Tuesday? A. I looked out there *Tuesday*, the lock and all was on the crib.

"Q. You had been around the crib on Sunday? A. Yes sir." (Italics added.)

The sheriff testified that the following day (Wednesday, June 19) he talked to Sumeral in Belmont, Mississippi, where the latter worked. Later the sheriff had occasion to talk to him about the disappearance of the wire:

"Q. What did he say on that occasion? A. He said he didn't get the wire, but he guessed he could find it in fifteen or twenty minutes, but he didn't get it then, he said anyway that that truck wouldn't leave enough prints for me to get a print of it, he did make that statement.

"Q. Do you recall any other statement he made on that occasion in regard to the facts of this case? A. No sir, I don't.

"Q. Do you recall anything else that you asked in regard to the facts of the case at that time? A. No sir.

"Q. Did you talk to him any time after that in regard to the facts of this case? A. No sir, not as I recall."

The most we can infer from the foregoing is: (1) the wire disappeared sometime between Monday morning and 5:00, P.M., Tuesday (we are inferring only *arguendo* that the next to the last quotation above was intended to refer to *Sunday* rather than Tuesday); (2) the defendant had the truck on Monday night; (3) the truck, at sometime before 5:00, P.M., Tuesday, was on the abandoned public roadway some 180 feet from the crib; (4) sometime between Sunday and Tuesday, the wire had been carried or rolled through the weeds;

and (5) the defendant "guessed he could find" the wire.

The evidence—aside from a possible implication from the last above quoted excerpt which we discuss below—was wholly circumstantial.

Circumstantial evidence is not inferior evidence:

"I remember so well that from time to time men who are not trained in the law have looked with suspicion upon circumstantial evidence and yet so many of the, of our every day acts and our dealings are based upon circumstantial evidence. We just assume that certain things are true because experience has shown that those things are true. We assume when we go to bed at night that the sun is going to rise the next morning because our practical experience has told us that we might expect that. Likewise if we have a heavy snow and we walk down through the woods and we see tracks in the snow, we know from the existence of those tracks that since it snowed a rabbit has passed that way and we would be perfectly willing to accept that demonstration of circumstances just as faithfully as we would the evidence of our own senses or eyes if we had seen the rabbit first run through the snow, and so circumstantial evidence is entitled to the same weight that direct evidence is entitled to *provided that it points one way.*"— from oral charge by Hon. Seybourn H. Lynne in United States v. Bostwick, N.D.Ala. (on appeal at 5 Cir., 218 F. 2d 790). (Italics added.)

■ However, circumstantial evidence is evidence only if it (along with the other evidence) is susceptible of a reasonable inference pointing unequivocally to the defendant's guilt. The law allows great latitude on admissibility in a case where the prosecution relies mainly on circumstantial evidence, e. g., Willis v. State, 37 Ala.App.

185, 66 So.2d 753. Here we are not concerned with admissibility but sufficiency.

On appeal where, as here, there was a motion to exclude all the State's evidence and the denial thereof was again put to the trial judge on motion for new trial, we are not considering the degree of proof for the purpose of charging a jury on circumstantial evidence. Rather we must stake out the permissible area of reasonable deliberation by a jury.

Thus, in Vick v. United States, 5 Cir., 216 F.2d 228, 232, we find the court, per Rives, J., saying:

"* * * In such cases the test to be applied on motion for judgment of acquittal and on review of the denial of such motion is not simply whether in the opinion of the trial judge or of the appellate court the evidence fails to exclude every reasonable hypothesis, but that of guilt, but rather whether the jury might reasonably so conclude. Curley v. United States, 81 U.S.App. D.C. 389, 160 F.2d 229, 232, 233; cf. Yoffe v. United States, 1 Cir., 153 F. 2d 570, 572; Remmer v. United States, 9 Cir., 205 F.2d 277, 287. 'The weight of circumstantial evidence is a question for the jury to determine; such evidence alone or in connection with other evidence may justify a conviction. Great care, however, must be exercised in drawing inferences from circumstances proved in criminal cases, and mere suspicions will not warrant a conviction.' 20 Am.Jur., Evidence, Sec. 1217, p. 1070. As said by Judge Prettyman in Curley v. United States, supra, 'The task of the judge in such case is not easy, for the rule of reason is frequently difficult to apply, but we know of no way to avoid that difficulty.' * * *"

■ In Bluth v. State, 38 Ala.App. 692, 92 So.2d 685, 690, we stated the major premise, per Harwood, P. J.:

"* * * An accused charged with a felony should not be convicted on

circumstantial evidence unless it shows by a full measure of proof that the defendant is guilty, and must exclude to a moral certainty every other reasonable hypothesis but that of the guilt of the accused, if the facts and circumstances can be reconciled with the theory that some agency other than the accused may have caused the death, then the accused is not shown to be guilty by that full measure of proof which the court requires. * .* * "

And bringing this rule to bear on the facts there at hand, we concluded the State had failed to adduce all of the elements requisite to conviction: that is, Bluth's agency in Mrs. Meighen's death was not established within those limits which mark off the jury's exclusive province. See also Ex parte Acree, 63 Ala. 234.

■ No possession of the goods was shown; the testimony to put Sumeral at the scene covered only, at the most, eight hours of a span of some thirty to thirty-five hours.

"* * * Opportunity to commit crime, or even a knowledge of its commission, without more, is not sufficient evidence upon which to base a verdict of guilt. * * * " Thomas v. State, 19 Ala.App. 499, 98 So. 322.

See also Lang v. State, 252 Ala. 640, 42 So.2d 512 (4–2 decision), and Bell v. State, 36 Ala.App. 390, 56 So.2d 683.

Even under the State's evidence, the question of whether or not Sumeral had an opportunity to take and carry away the fencing was left with an open end answer. This failure to close the gap did not come up to the measure of proof laid down in Ellison v. State, 254 Ala. 428, 48 So.2d 176, a case where the defendant undoubtedly had an opportunity but not the sole opportunity to kill the deceased.

Oliver, the owner of the pick-up truck, did not (nor did any other witness) account for its whereabouts during the time the theft could have occurred (Monday morn-

ing to 5:00 P.M., Tuesday), save for the time that Sumeral had it. On cross-examination Oliver testified:

"Q. Mr. Oliver, was it your practice just to leave the key in that old pick-up you had since you had had it? A. Yes, I just had it out there, the switch was hard to get off, and in fact, I'd never taken the key out of my new one in the yard.

"Q. That being so, it would have been possible for anyone who came there in the night to use it without your knowledge, wouldn't it? A. Well, possibly could have, and I wouldn't have heard it leave, I possibly wouldn't have gotten up, I would have thought it was some one coming in or going out or had brought the truck back, it could have happened that way.

\* \* \* \* \* \*

"Q. Do you have a judgment about what time you heard it? A. I didn't get out of bed. I remember hearing it once drive in by the corner of the house, I slept in the back of the house.

"Q. What you heard could have been somebody driving it off again, the pick-up—the noise that you heard and everything? A. It is possible, but I wouldn't think so, I don't know—if they did it was unbeknowing to my knowledge.

"Q. But it is possible it could have been done? A. Yes, it is possible that it might have been done."

We find nothing inculpatory of *larceny* in the defendant's statement that he "guessed" he could find the wire. The statement might (1) show him to be guilty of compounding a felony; (2) indicate his willingness to be an informer; (3) be construed as an offer to help the sheriff search for the missing wire; or (4) be an offhand claim or boast of his intuitive ability to locate things.

In Fowler v. State, 170 Ala. 65, 54 So. 115, 116, evidence of accused giving a

promissory note to the owner for part of his lost money was held relevant:

"* * * the implied admission of guilt involved in giving the note, under the circumstances testified to by the state's witness, was evidence relevant to the charge. In connection with the evidence touching the execution of the note and its attendant circumstances, the state offered testimony which went to show that the giving of the note was the free act of the defendant uninfluenced by hope of favor or fear of harm. * * *"

Judge Carr, in going to the original record of Spurlock v. State, 17 Ala.App. 109, 82 So. 557, culled therefrom certain admissions by the defendant showing a desire on his part to make restitution, i. e., evincing what a reasonable man could infer was a sense of responsibility for another's loss, Bell v. State, supra.

The penitentiary door should not be bolted by the vague word "guess."

The principle applied here is the same given in Ivey v. State, Ala.App., 108 So. 2d 430. Here the facts do not show the agency of the accused, and, accordingly, the judgment below is due to be reversed and the cause remanded.

Reversed and remanded.